**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-726 (CJN)** |
| **JOSIAH KENYON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Josiah Kenyon to eighty-eight months' incarceration, at the midpoint of the 78 to 97 month guideline range as calculated by the U.S. Probation Office and agreed upon by the parties, three years of supervised release, $2,000 in restitution for participation in the Capitol riot, $41,315.25 in restitution for damage to a Capitol window, and the mandatory $100 special assessment for each count of conviction.

## I.    INTRODUCTION

The defendant, Josiah Kenyon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the plea agreement in this case includes a loss amount of $1,495,326.55, which was accurate as of May 17, 2021, as of October 17, 2022, the approximate losses suffered as a result

1

Kenyon, an unemployed, 35-year-old man, travelled by car to Washington, D.C. from Reno, Nevada with his wife and young children. On January 6, 2021, he joined other rioters who breached the U.S. Capitol and spent approximately 30 minutes walking through the building. He used his fist and a flagpole to damage a large exterior window. Finally, in what was undisputedly his most egregious behavior, Kenyon joined and participated in assaulting police officers with a large and violent group of rioters at the Capitol's Lower West Terrace tunnel. There, Kenyon used several large objects to violently assault officers attempting to the guard the tunnel area. At one point, Kenyon used a table leg with a protruding nail to strike an officer in the leg and then to strike a second officer on the head such that Kenyon's weapon became lodged in the officer's face shield and helmet.

The government recommends that the Court sentence Kenyon to 88 months' incarceration, which is within the advisory Guidelines' range of 78–97 months, a range the parties agree is the correct guidelines calculation. An 88-month sentence reflects the gravity of Kenyon's conduct while acknowledging his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 20, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

2020 presidential election.

### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021), Statement of Officer Michael Fanone, available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  Figure 1; "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-

do/programs-ceremonies/inauguration.



*Figure 1*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows in the first set of doors, and police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who

continued to resist.  The mob continued to grow, and the rioters pushed their way into the second

set of doors, assaulting police with batons, poles, chemical spray, bottles and other items.  Officers

created a line in the doorway to block the rioters and physically engaged them with batons and OC

spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described

her experience nearby this location in response to testimony from MPD Officer Daniel Hodges,

who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful
> transfer of power, and it was an attack on this Capitol building, but it was also an
> attack on real people.  And most people don't know this -- and I don't think even
> you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m.
> on January 6th, 2021, while you were holding back the mob at the Lower West
> Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small
> office about 40 paces from the tunnel that you all were in.  That's about from the
> distance where I'm sitting here on the dais to that back wall.  And from that office
> in close proximity to where you all held the line, I listened to you struggle.  I
> listened to you yelling out to one another.  I listened to you care for one another,
> directing people back to the makeshift eyewash station that was at the end of our
> hall.  And then, I listened to people coughing, having difficulty breathing, but I
> watched you and heard you all get back into the fight.

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD

Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th

Attack on the United States Capitol, 117 Cong. (July 27, 2021), Statement of Rep.

Stephanie Murphy, available at https://www.c-span.org/video/?513434-1/capitol-dc-

police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and

doorway area continued for over two hours, during which time rioters repeatedly assaulted,

threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved

intense hand-to-hand combat, and some of the most violent acts against law enforcement, including

the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).

Despite the mob's efforts, the officers in the LWT tunnel held the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.

*Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional

munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

### B.      Defendant's Role in the January 6, 2021 Attack on the Capitol

#### *Kenyon's Entry into the Capitol*

Josiah Kenyon and his family drove the approximately 2,500-mile distance from Nevada to Washington D.C. to attend the "Stop the Steal" rally held on January 6, 2021. But shortly before 3:00 p.m., Kenyon—dressed as the character Jack Skellington from *The Nightmare Before Christmas*[2]—had left the rally's original site behind.  Instead, Kenyon joined the mob descending upon the Capitol and eventually made his way to the Senate Wing Door area just outside the Capitol building.

---

[2] The following is a photo of the defendant from January 6, 2021, next to a photo of the character Jack Skellington:




As revealed by U.S. Capitol building CCTV, Kenyon entered the Capitol building at approximately 2:53 p.m. and stayed inside for approximately 25 minutes.  In Figure 2, taken at approximately 3:07 p.m., he is circled in red and is  inside and close to  the Senate Wing Doors.



*Figure 2*

Kenyon is seen again in the crypt area at approximately 3:18 p.m. in Figure 3:



*Figure 3*

Kenyon left the building soon afterwards. Another person recorded video that showed Kenyon attempting to use his fist to break a large exterior window next to the north doors of the Capitol, as seen in Figure 4, below.



*Figure 4*

Failing to make any headway, Kenyon picked up a flagpole and began damaging the window with greater force, as seen in Figure 5, below and Exhibit A.



*Figure 5*

**Assaults on MPD Officers at the LWT Tunnel**

Kenyon eventually made his way to the LWT tunnel, and for a ten-minute period—from

10

approximately 4:54 p.m. until 5:04 p.m. — he wreaked havoc on police officers. He forcibly and

violently assaulted numerous MPD officers who were defending the entrance to the LWT tunnel.

Kenyon's conduct was captured on U.S. Capitol building CCTV, MPD body-worn cameras

("BWC"), and what appeared to be mobile devices of persons present on the scene.

For instance, Kenyon pushed an unknown white object towards officers at 4:56:18 p.m. as

seen in Figure 6:



*Figure 6*

He threw another unknown object towards officers at 4:56:42 p.m. as seen in Figure 7:



*Figure 7*

Kenyon threw a large, plastic pylon towards officers at 5:01 p.m. as seen in Figure 8:



*Figure 8*

The same pylon-throw is seen from a different angle in Figure 9:



*Figure 9*

The pylon struck MPD Officer I.F.'s riot shield. Exhibits B, C, and I.

Finally, at around 5:01:24, Kenyon began to strike various officers with a table leg. Exhibits D, E, G, I. The table leg appeared to initially have had a nail protruding from it. At one point, he struck MPD Officer K.H. causing Officer K.H. to fall to the ground. Kenyon lashed out at other officers with the table leg, including hitting MPD Officer C.L. in the head. Officer C.L. was wearing a riot helmet and as Kenyon struck him with the table leg, the table leg became lodged between the opening at the top of the officer's face shield and his helmet. Because it was lodged in the helmet, as Kenyon pulled back on the table leg, Officer C.L.'s helmet actually lifted up and off of the officer's face. Exhibit I.

Kenyon at one point voiced his objective to the crowd: "Hold the line!"  Exhibit H.

*Injuries*

As a result of Kenyon's assault on January 6, Officer K.H. suffered pain and swelling in his right ankle.

*Kenyon's Post-Arrest Interview with the FBI*

Upon arrest, Kenyon told FBI agents that he was at the Capitol on January 6, 2021 and tried to breach a door he was not supposed to enter. He identified himself as the person in the pinstripe "Jack Skellington" costume in Figure 10:



*Figure 10*

He told agents that he hated Trump and that he was at the Capitol on January 6 because he was "trying to raise the violence level." He claimed to be a "Communist" and that he wanted law enforcement "to shoot [the Trumpers] all down." He admitted to striking an officer with a table leg, first in the knee and again in the foot. His idea was to have "the Trumpers" charge the police

line which would in turn cause the officers to shoot the rioters. Kenyon explained to the agents

that in January 2021 he was depressed and "really unbalanced."

## III.    THE CHARGES AND PLEA AGREEMENT

On December 10, 2021, a federal grand jury returned an indictment charging Kenyon with:

- Civil Disorder in violation of 18 U.S.C. § 231(a)(3);

- two counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b);

- Destruction of Government Property over $1000 in violation of 18 U.S.C. § 1361;

- Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and

- Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On August 24, 2022, the government filed an Information charging Kenyon with another

count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon,

Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a)(1) and (b).

On September 14, 2022, Kenyon pleaded guilty to Count 3 of the indictment charging

assault on a federal officer (Officer C.L.) with a dangerous weapon, in violation of 18 U.S.C.

§ 111(a)(1) and (b) and to the information charging a second, separate assault on a federal officer

(Officer K.H.) with a dangerous weapon resulting in bodily injury, in violation of 18 U.S.C.

§ 111(a)(1) and (b).[3]

## IV.    STATUTORY PENALTIES

Kenyon now faces sentencing on two counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b). One of those counts—Count One of the Information—also charges that Kenyon inflicted bodily injury on the victim police officer.

As noted by the plea agreement and the U.S. Probation Office, Kenyon faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for each count of conviction.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The parties, in the Plea Agreement, and the U.S. Probation Office, in the PSR,  concluded that Kenyon's Total Offense Level is 28.  PSR ¶ 62; Plea Agreement, Doc. 19, p. 3.  However, the

---

[3]  Count Three of the indictment charged the assault on Officer C.L., and the information charged the assault on Officer K.H.

16

Probation Office made an error in its calculation, although the error does not affect the combined adjusted offense level, as explained below.

Count One of the information and Count Three of the indictment charged the identical statutory offense, 18 U.S.C. § 111(a)(1) and (b), and in turn, the Probation Office calculated the identical Adjusted Offense Level for Count One and Count Three, as follows:

### Count One of the Information (charging the assault on Officer K.H.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction pursuant to §111(b) | +2 |
| U.S.S.G. § 3A1.2.(b) | Official victim | +6 |
| | *Adjusted Offense Level (subtotal)* | *29* |

### Count Three of the Indictment (charging the assault on Officer C.L.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction pursuant to §111(b) | +2 |
| U.S.S.G. § 3A1.2.(b) | Official victim | +6 |
| | *Adjusted Offense Level (subtotal)* | *29* |

PSR ¶¶ 35-54.

The Probation Office then applied a two-level increase for the multi-count adjustment and a three-level decrease for acceptance of responsibility, and concluded that the Total Offense Level was 28:

| | | |
|---|---|---|
| U.S.S.G. § 3D1.4 | Greater of the adjusted offense levels | 29 |
| U.S.S.G. § 3D1.4(a) | Multi-count adjustment | +2 |
| | Combined adjusted offense level | 31 |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
| | Total Offense Level | 28 |

PSR ¶¶ 55-62.

The Probation Office's calculation of the Adjusted Offense Level (subtotal) for Count Three is erroneous, because Officer C.L., the victim of the assault charged in Count Three, did not suffer bodily injury as that term is defined in U.S.S.G. § 1B1, Application Note 1(B).  Accordingly, the Probation Office should not have applied the three-level increase for bodily injury in calculating the Adjusted Offense Level (subtotal) for Count Three.  Without that increase, the Adjusted Offense Level (subtotal) for Count Three is 26, not 29.  Nonetheless, once the Probation Office applied the multi-count adjustment of U.S.S.G. § 3D1.4, that error had no effect on the Total Offense Level, which is 28, regardless of whether the Adjusted Offense Level (subtotal) for Count Three is calculated as 26 or 29.[4]

The correct calculation of the Total Offense Level is as follows:

**Count One of the Information (charging the assault on Officer K.H.)**

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction pursuant to §111(b) | +2 |
| U.S.S.G. § 3A1.2.(b) | Official victim | +6 |
| | *Adjusted Offense Level (subtotal)* | *29* |

**Count Three of the Indictment (charging the assault on Officer C.L.)**

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction pursuant to §111(b) | +2 |
| U.S.S.G. § 3A1.2.(b) | Official victim | +6 |
| | *Adjusted Offense Level (subtotal)* | *26* |
| | | |
| U.S.S.G. § 3D1.4 | Greater of the adjusted offense levels | 29 |
| U.S.S.G. § 3D1.4(a) | Multi-count adjustment | +2 |

---

[4] In an oversight, the government did not note this error in responding to the draft PSR.

|  | Combined adjusted offense level | 31 |
|---|---|---|
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
|  | Total Offense Level | 28 |

Thus, the Total Offense Level is 28, as Kenyon acknowledged in his plea agreement.[5]

Kenyon's Criminal History Category of I is also undisputed.[6] Accordingly, based on the parties' agreed-upon Total Offense Level of 28 and a Criminal History Category of I, Kenyon's Guidelines imprisonment range is 78 to 97 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court

---

[5] The Guilty Plea Agreement included a single "shorthand" calculation of the guidelines that did not differentiate between Counts One and Counts Three, as follows:

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction pursuant to §111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official victim | +6 |
| U.S.S.G. § 3D1.4 | Grouping (2 units) | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
|  | Total Offense Level | 28 |

Guilty Plea Agreement, Doc. 19, p. 3. While the government's presentation of the guidelines calculation in the Guilty Plea Agreement did not follow the formal dictates of U.S.S.G. § 1B1.1(a)(4) (directing that the offense level be first calculated for each count individually, prior to determining the total offense level), the end result of its calculation was correct: the Total Offense Level is 28.

[6] In the plea agreement, the government estimated that Kenyon had no countable prior convictions, resulting in a criminal history score of 0 and a criminal history category of I. Guilty Plea Agreement, ECF 19, p. 3. The Probation Office determined that one of Kenyon's prior convictions does result in one criminal history point. PSR ¶ 67. Upon further review, the government concurs with the Probation Office. However, as noted by the Probation Office, this does not change Kenyon's criminal history category, which remains I. PSR ¶ 68.

must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any acts of property destruction or violence; (3) the

20

defendant's reaction to acts of violence or destruction; (4) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (5) whether the defendant cooperated with, or ignored, law enforcement; and (6) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Kenyon spent multiple hours on Capitol ground on January 6. He entered the building and damaged property. He then engaged in some of the most violent behavior of the day in possibly the most violent area during the riot. Although only present for approximately ten minutes at the LWT tunnel area, Kenyon used numerous weapons to attack officers who were merely attempting to do their jobs defending the United States Capitol building and the people inside it. Kenyon not only assaulted officers, but he used dangerous weapons and was successful in inflicting bodily injury on at least one officer. His crimes are well-worthy of an 88-month sentence.

### B.  The History and Characteristics of the Defendant

Although Kenyon is in criminal history category I, his criminal background is nevertheless highly concerning. Prior convictions include assault, burglary, weapons charges, and drug offenses.[7] And although only his most recent conviction merited a criminal history point, this Court should absolutely consider his violent background in fashioning an appropriate sentence.

---

[7] Kenyon, age 35, has five prior convictions, beginning with a juvenile conviction for assault with a deadly weapon in 2002, and continuing with a conviction for burglary in 2005, "loud/unreasonable noise" in 2006, carrying a concealed dirk or dagger in 2007, and most recently, possession of a controlled substance in 2021. Kenyon pled guilty to the drug offense in May 2021, but he failed to appear for sentencing the following month. A bench warrant was issued.

As part of his presentence interview, Kenyon told the officer that he suffers from depression, bipolar disorder, and Post Traumatic Stress Disorder. PSR ¶ 88. Upon arrest, he was found with a Glock handgun and a Ruger AR15.

A middle-of-the-range sentence is appropriate.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Kenyon's criminal conduct, including assaulting *multiple* law enforcement officers with weapons and causing injury, is the epitome of disrespect for the law. When Kenyon entered the Capitol grounds, and the Capitol building itself, it was abundantly clear that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that repeated assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Indeed, although Kenyon finds himself in a criminal history category I, a closer review indicates an absolute penchant for violence. Further, by his own admission, Kenyon was at the Capitol on January 6 to incite chaos, violence, and destruction, and he fully accomplished his goal, both by damaging property and assaulting and injuring officers. Kenyon's behavior is worthy of a lengthy, middle-of-the-guideline sentence.

---

[9] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).

In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.     Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

There have been relatively few convictions for even a single violation of Section 111(b) among the January 6 defendants. One such case is *United States v. Andrew Mazza*, 21-cr-736 (JEB). There, the defendant brought two loaded handguns with him to Washington, D.C. After attending the rally while armed with both firearms in holsters on his person, Mazza marched to the U.S. Capitol and joined in efforts to move through restricted Capitol grounds. Mazza lost one of

the guns but joined the mob of other rioters attempting to break through the police line at the LWT tunnel while armed with the other gun. He repeatedly pushed against officers using the combined physical exertion of the mob; he armed himself with a stolen police baton and assaulted officers with the baton; he yelled at officers to get out the mob's way of the rioters. Afterwards, Mazza filed a false police report about how he had lost one the guns and provided false information to U.S. Capitol Police Special Agents. Based on a Guidelines range of 57 to 71 months, Judge Boasberg sentenced Mazza to 60 months' incarceration.

*United States v. Devlyn Thompson*, 21-cr-641 (RCL) has some important similarities to this case. For instance, Thompson was involved in striking an officer with a baton one time in the LWT tunnel and, like Kenyon, he pleaded guilty to violating 18 U.S.C. §§111(a)(1) and (b). Thompson also observed the activity in the LWT tunnel before making his way to the front of the tunnel where he then took the opportunity to grab an object from the ground to strike an officer. *Thompson*, however, involved several unusual factors that are not implicated in this case. Thompson was relatively unique in that his remorse and his efforts to assist law enforcement were exceptional: prior to being arrested or even approached by law enforcement officials, Thompson obtained counsel and contacted government counsel to provide assistance to the January 6th investigation. Thompson entered into a plea agreement and pled guilty without being arrested. Thompson also argued at sentencing that he suffered from autism spectrum disorder (Asperger's Syndrome) and that mitigated his conduct. Thompson was sentenced to 46 months' incarceration, a sentence within the guideline range in that case. Kenyon, unlike Thompson, assaulted multiple officers with multiple dangerous weapons, inflicted bodily injury on at least one officer, and caused property damage to the Capitol building. He admitted to wanting to cause chaos and

violence and was successful in that endeavor and has shown no remorse.

In *United States v. Thomas Webster*, 21-cr-208 (APM), the defendant, like Kenyon, played a violent role in the attack on the Capitol. Webster was a former military member and retired police officer. Like Kenyon, Webster was an agitator who riled up the mob with his behavior. Webster violently attacked a police officer on the LWT, which resulted in opening a breach in the police line and a flood of rioters towards the Capitol. Unlike Kenyon, however, Webster did not plead guilty and was convicted of all charges, including a violation of 18 U.S.C. § 111(a) and (b). Judge Mehta sentenced Webster to 120 months' incarceration.

These cases confirm that significant periods of incarceration for January 6 defendants who assaulted law enforcement officers in the LWT tunnel are appropriate and support a sentence of 88 months' imprisonment in this case.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[10] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kenyon must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Kenyon played in the riot on January 6.[11] Plea Agreement at ¶ 12. Although the parties agreed that the riot at the United States Capitol caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021, *id.*, as of October 14, 2022, the figure has nearly doubled to $2,881,360.20. The parties have also agreed that Kenyon must pay $41,315.25 in restitution for the damage he inflicted to a Capitol window. Kenyon's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶136.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of eighty-eight months' incarceration, which is a mid-range sentence as correctly calculated by the government, and agreed upon by the parties in the plea agreement and PSR, three years of supervised release, $2,000 in restitution for participation in the Capitol riot, $41,315.25 in restitution for damage to a Capitol window, and the mandatory $100 special assessment for each count of conviction.

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Nathaniel K. Whitesel*
        NATHANIEL K. WHITESEL
        Assistant United States Attorney
        DC Bar No. 1601102
        601 D Street NW
        Washington, DC 20530
        nathaniel.whitesel@usdoj.gov
        (202) 252-7759